**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | | |
|---|---|---|
| **Deborah Pilley aka Pilley Bianchi dba** | ) | |
| **The Chaser Initiative and Robin Pilley** | ) | |
| | ) | **Civil Action No.: _____** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **COMPLAINT** |
| **v.** | ) | |
| | ) | **(Jury Trial Demanded)** |
| **Spartanburg County Commission for** | ) | |
| **Technical and Community Education** | ) | |
| **d/b/a Spartanburg Community College,** | ) | |
| **Spartanburg Community College** | ) | |
| **Foundation, Inc. and Michael Mikota,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiffs Deborah Pilley aka Pilley Bianchi dba The Chaser Initiative ("Bianchi") and Robin Pilley ("R. Pilley") (Bianchi collectively with R. Pilley, "Plaintiffs"), by and through its undersigned counsel, alleges and complains against Spartanburg County Commission for Technical and Community Education dba Spartanburg Community College ("SCC"), Spartanburg Community College Foundation, Inc. (the "Foundation") and Michael Mikota ("Mikota"), allege the following:

**THE PARTIES**

1. Bianchi is a resident of Brooklyn, New York and does business as The Chaser Initiative and provides the goods and services described herein under the trademark The Chaser Initiative.

2. R. Pilley is a resident of Spartanburg County.

3. Dr. Pilley (now deceased) was a resident of Spartanburg County. All Dr. Pilley's rights have been bequeathed to Bianchi and/or R. Pilley.

4.     SCC is the commission in charge of and overseeing the day-to-day activities of the community college that it operates at 107 Community College Drive, Spartanburg, South Carolina.

5.     The Foundation is a non-profit organization organized and existing under the laws of South Carolina and having an address of 107 Community College Drive, Spartanburg, South Carolina.

6.     Mikota is the president of SCC, who exercises a right to direct and control the actions of SCC and resides within Spartanburg County, South Carolina.

**JURISDICTION**

7.     This action arises under the Lanham Act pursuant to 15 U.S.C. §§ 1051 et seq, 17 U.S.C. §§ 101.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 2201.

8.     The state and common law causes of action are properly before this Court pursuant to 28 U.S.C. §§ 1338(b) and 1367.

9.     Venue is proper under 28 U.S.C. § 1391(b), as all Defendants reside in this District and Division.  Moreover, a substantial portion of the acts or omissions alleged herein occurred in this District and Division.

**FACTS COMMON TO ALL CAUSES OF ACTION**

10.     Bianchi is the daughter and heir of Dr. Pilley.

11.     R. Pilley is the daughter and heir of Dr. Pilley.

12.     Dr. Pilley, who is now deceased, was a Professor Emeritus of Psychology at Wofford College.

13.     Dr. Pilley conducted extensive research regarding the learning capacity of canines.

14.     As part of that research, Dr. Pilley taught his pet dog named "Chaser" to understand over 1,000 unique words as well as several elements of syntax.

1403213v1

15.    Dr. Pilley's research and work with Chaser became well known locally, nationally and internationally.

16.    Dr. Pilley's work with Chaser was covered by multiple national media outlets, including, but not limited to, the Today Show, 60 Minutes, ABC World News Tonight, PBS' Nova Science Now, The New York Times and National Geographic Wild.

17.    In 2011, Dr. Pilley published the New York Times bestseller "Chaser: Unlocking the Genius of the Dog Who Knows a Thousand Words."

18.    Bianchi served as a ghost writer for the above referenced book and made significant contributions thereto.

19.    Through their work together and the coverage of that work by numerous third parties, Dr. Pilley and Chaser became inexorably linked, such that reference to one was essentially a reference to the other and/or the reference to one conjures thoughts of and/or an association with the other.

20.    Dr. Pilley passed away in 2018 while Chaser passed away in 2019.

21.    In 2019, four - five large murals were created and prominently displayed in downtown Spartanburg.  These murals displayed "#chaserthestatue", which in turn advertised the unveiling of a bronze statue of Chaser located in Morgan Square.

22.    Bianchi and R. Pilley provided substantial design input and held final approval authority for the statue.

23.    The statue was unveiled in May 2021, and it remains standing to this day.

24.    Bianchi gave the keynote speech at the statue unveiling ceremony.

25.    Bianchi distributed to attendees of the ceremony merchandise and promotional materials branded with "The Chaser Initiative" mark.

26.   In January 2020, Bianchi formed The Chaser Initiative and began preparing educational classes, seminars and workshops to be presented in public schools throughout South Carolina.

27.   In March 2020, Bianchi registered the domain, www.thechaserinitiative.com, which provided information about Dr. Pilley's work with Chaser as well as other educational materials. The website provides users the ability to schedule educational seminars, classes and workshops.

28.   On approximately September 20, 2020, Bianchi and R. Pilley attended a video conference call with Mikota and other SCC representatives.

29.   During that conference call, Mikota stated that SCC was interested in partnering with Bianchi and R. Pilley on the idea of having the SCC mascot be a border collie named Chaser such that SCC would be known as the Spartanburg Community College Chasers. All involved agreed the mascot would be a representation of Dr. Pilley's dog, Chaser. *See* Ex. 1, pg. 2

30.    Mikota went on to say that SCC wanted to work with the Pilley family so that the mascot would invest in and highlight the memory and life of Dr. Pilley and Chaser.  *Id.*

31.   Mikota explained that SCC wanted a partnership with the Pilley family and an understanding that SCC would not do anything to damage the memory of Dr. Pilley, Chaser and/or their research and legacy.  *Id.*

32.   Mikota repeatedly stated that any use of the Chaser mascot would be in partnership with the Pilley family who was being represented by Bianchi and R. Pilley.

33.   Mikota further acknowledged that SCC's use of the Chaser mascot would necessarily implicate the story and legacy of Dr. Pilley and his work with his pet and research subject, Chaser. *Id.* at pg. 9.

34.   In reliance on the representations made by Mikota and other SCC representatives, Bianchi agreed to provide SCC with a photograph that she took of Chaser with Anderson Cooper

(the "Chaser Photo") so that SCC could use the Chaser Photo to create potential logos and mascot images based upon that Chaser Photo that could then be reviewed and approved by Bianchi and R. Pilley.

35. In reliance on the representations made by Mikota and other SCC representatives, Bianchi agreed to provide SCC with another photograph that she took of Chaser as she was jumping. SCC used this image to create the following logo , which SCC adopted and used extensively pursuant to the license agreement.

36. On approximately November 9, 2020, Bianchi and R. Pilley attended another video conference call with Mikota and other SCC representatives. *See* Ex. 2.

37. During the call, Mikota stated that SCC had been taking internal steps to prepare for the adoption of the Chaser mascot and invited Bianchi and R. Pilley to provide their input and to attend as many of SCC's planning meetings regarding the adoption of the Chaser mascot as possible.

38. Specifically, Mikota requested input from Bianchi and / or R. Pilley regarding the nature and/or content of the messaging for SCC's use of the Chaser mascot and to provide feedback on any mascot adoption actions taken by SCC prior to the conference call.

39. During the conference call, Jane Byrd, an artist employed and/or hired by SCC, displayed various logos and materials that she created from the Chaser Photo that Bianchi previously provided.

40. Byrd went on to explain that Chaser "embodies a designer's dream" because her appearance stands out from that of typical border collies.

41.    Byrd also explained that the use of the Chaser image and/or logo would pay tribute to Dr. Pilley and his legacy.

42.    Based on the representations and promises made by Mikota and other SCC representatives, Bianchi and R. Pilley entered into a verbal license agreement wherein SCC could use the images, logos and mascot designs created from Bianchi's Chaser Photo, as well as other materials provided by Bianchi, and to use "Chaser" and/or "Chasers" as a trademark to identify SCC's educational goods and services.

43.    The parties understood that pursuant to the license, Bianchi and R. Pilley would have approval and/or veto power with respect to the manners in which the logos, mascot and/or trademarks could be used to protect the legacy created by Dr. Pilley and Chaser and represented by such images the logos, mascot and trademarks.

44.    In December 2020, Bianchi provided substantial input as to the approved look of the mascot, which SCC accepted when formulating the final design of the Chaser mascot.

45.    On approximately March 5, 2021, SCC signed an agreement with The Chaser Initiative pursuant to which Ingrid Norris would teach first aid for dogs and cats under the mark The Chaser Initiative.  On behalf of The Chaser Initiative, Ms. Norris provided these classes at SCC from approximately September 2021 – May 2025.

46.    SCC announced its adoption of the Chaser mascot on November 2, 2021, with Bianchi delivering a speech as part of the ceremony.  With the approval of Bianchi and R. Pilley, SCC began publicly displaying the logos and mascot designs derived from Bianchi's Chaser Photo as well as using the Chaser trademark to identify the source of its goods and services.

47.    On or about November 2, 2021, SCC publicly displayed on its website a webpage discussing SCC's adoption of the Chaser mascot and included an entire section entitled "Why the

1403213v1

Chasers?" that explained the link between SCC's selection and adoption of the mascot and Dr. Pilley's work with Chaser. *See* Ex. 3.

48.     On the webpage, SCC stated that "we want the story of Chaser's connection as the SCC mascot to be known by everyone in the Upstate." The webpage further stated that "much like Chaser's story, the lasting legacy of our students' education won't be limited to what they know, but rather the spirit in which they learned…"

49.     From September 2021 to October 2025, a representative of The Chaser Initiative provided numerous educational seminars at public schools throughout South Carolina under The Chaser Initiative brand name. At each seminar, goody bags were handed out that included coloring books, crayons, tote bags and flyers, all of which were branded with The Chaser Initiative and featured images of Chaser.

50.     Bianchi presented SCC with a copy of Dr. Pilley's book that included an inked paw print of Chaser as a "pawtograph." To create the pawtograph, Bianchi dipped Chaser's paw in ink and then pressed it against the title page of Dr. Pilley's book. This pawtographed version of the book is very rare and limited in number.

51.     SCC used Dr. Pilley's book and more specifically, the paw print contained therein to create a logo that reproduced the paw print as closely as possible.

52.     Pursuant to the license agreement, SCC adopted and prominently used the paw logo. SCC later filed at least two trademark applications on its recreations of Chaser's paw print.

53.     In April 2023, Bianchi contacted SCC to discuss its use of a photograph of Chaser in SCC's marketing materials that Bianchi felt was unacceptable. SCC agreed to discontinue use of the photograph and instead adopted use of another photograph that was provided by Bianchi for SCC's approved and licensed use.

54.    In August 2023, Bianchi published a book that she authored entitled "For the Love of Dog, The Ultimate Relationship Guide."  Bianchi's book became a number 1 best seller on Amazon and the winner of the 2024 AKC Family Dog Award.

55.    In late May or early June of 2024, Bianchi contacted Mikota to discuss a written license agreement that would memorialize the verbal agreement that had been governing SCC's use of the Chaser logos, mascot design and trademark.

56.    On the morning of October 22, 2024, Mikota delivered to Bianchi a proposed written license agreement.

57.    In that proposed agreement, SCC stated that "prior to this Agreement, certain members of the Pilley Group authorized SCC to use Chaser's name, image and likeness as a mascot for SCC and in connection with the SCC Mission, and authorized the creation, authorship and development of intellectual properties by SCC related to Chaser in support of the SCC Mission."  *See* Ex. 3.

58.    The proposed license agreement further states that "photographs of Chaser, for which the Pilley Group owns the copyrights, have been used by SCC as models for various images and graphic representations created under the auspices of SCC, including by way of example but not



limited to the following (hereafter the Chaser Images)."

59.    The proposed license agreement further states that "it is the Pilley Group's desire that the legacy of Dr. Pilley and the beloved Chaser continues to inspire thousands of students, faculty, staff and community members, and the Parties intend this Agreement as an instrument that will facilitate pursuing that desire."

60.    The proposed license sought to have The Pilley Group grant and transfer to SCC an irrevocable exclusive license to (a) use Chaser and/or Chasers as the name of SCC's mascot; (b) to use Chaser and/or Chasers as trademarks identifying SCC as the source of its services; and (c) to make, use and sell photographs, images, models, and other items based upon the image of Chaser, such as the logos created from Bianchi's Chaser Photo.

61.    Many of the terms in the proposed license agreement were either in addition to the terms previously agreed upon by the parties and/or inconsistent with those previously agreed upon terms.

62.    Hours after providing Bianchi with the proposed written license agreement, SCC hosted a masterclass featuring Bianchi where she discussed her book "For the Love of Dog" as well as Dr. Pilley's work with Chaser.

63.    Since being provided with the proposed written license agreement, Bianchi entered into negotiations with SCC in which Mikota was Bianchi's primary point of contact at SCC.

64.    During those negotiations Bianchi learned that SCC was using the Chaser logo, images and/or mascot in manners that were not approved by Bianchi and / or R. Pilley and likely to tarnish and/or damage the reputation and/or legacy of Dr. Pilley and/or Chaser and are not authorized by the original license granted to SCC for use of the Chaser images, logos, mascot and/or trademarks.

65.    Bianchi and R. Pilley requested SCC to cease such uses.  SCC refused such requests.

66.    When it became clear that SCC had no intention of honoring the initial license agreement or negotiating a modification to the license agreement that would be mutually acceptable to all parties involved, Bianchi and R. Pilley terminated the license agreement.

67.    SCC continues to use the logos, images and mascot designs derived from Bianchi's Chaser Photo.

1403213v1

68.     SCC continues to use Chaser and/or Chasers as trademarks to identify the source of its goods and services.

### FIRST CAUSE OF ACTION
### Copyright Infringement
### Against All Defendants

69.     To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

70.     Bianchi is the author of the Chaser Photo.

71.     Bianchi is the owner of the copyrights to the Chaser Photo.

72.     The copyrights to the Chaser Photo have been registered with the Copyright Office and have been issued Copyright Registration No. Vau 1-557-840, having an effective registration date of June 29, 2025.

73.     The logos, images, trademarks and mascot designs adopted, used, displayed and distributed by SCC are substantially similar to and were derived from the Chaser Photo.

74.     SCC's adoption, use, display, and distribution of logos, images, trademarks and mascot designs derived from the Chaser Photo (the "Chaser Materials) was done at the direction and control of Mikota, who was the driving force behind SCC's actions with respect to the Chaser Materials.

75.     SCC's use of the Chaser Materials exceeded the scope of use permitted by the parties' license agreement.

76.     Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Materials in a manner that he knew would exceed the scope of use permitted by the license agreement.

77.   SCC's use of the Chaser Materials continued after the license agreement permitting use of the Chaser Materials was terminated.

78.   Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Materials after the license agreement had been terminated by Plaintiffs.

79.   The actions of SCC and/or Mikota constitute copyright infringement that was committed with knowledge and/or reckless disregard of Bianchi's rights.

80.   Through his direction and control of SCC with respect to its actions involving the Chaser Materials, Mikota was personally involved in the infringement of Bianchi's copyrights in the Chaser Photo and was the driving force behind SCC's infringement.

81.   It was Mikota's initial idea to adopt and use the Chaser Materials.

82.   Through its simultaneous involvement, approval, direction and control of SCC with respect to its actions involving the Chaser Materials, the Foundation served as another driving force behind SCC's infringement.  The Foundation provided consent and resources needed by SCC to carry out Mikota's idea and thus commit the infringement of the Chaser Photo.

83.   Bianchi is suffering irreparable harm as a result of the infringement.

84.   Bianchi is entitled to an injunction prohibiting Defendants from using the Chaser Materials or any other materials that would violate Bianchi's copyrights under the Copyright Act.

85.   Bianchi is entitled to the actual damages caused by Defendants' copyright infringement including a disgorgement of any profits that Defendants have made from their use of the Chaser Materials.

**SECOND CAUSE OF ACTION**
**False Designation of Origin Under 15 U.S.C. §1125**
**Against All Defendants**

1403213v1

86.     To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

87.     Bianchi is the owner of valid common law rights to the mark "The Chaser Initiative" ("Plaintiffs' Mark").

88.     Use of Plaintiffs' Mark in commerce predates any use of SCC's use of the "Chaser" and/or "Chasers" marks (the "Chaser Marks") in commerce.

89.     SCC's use of the Chaser Marks was made pursuant to a trademark license granted by Plaintiffs.  Accordingly, all rights (if any) associated with SCC's use of the Chaser Marks inured to the benefit of Plaintiffs pursuant to the license agreement.   Accordingly, Plaintiffs have ownership of and/or rights in the Chaser Marks.

90.     Plaintiffs' rights in Plaintiffs' Mark are superior to any rights that SCC may attempt to claim to the Chaser Marks and are enforceable against SCC.

91.     Plaintiffs' Mark is used to provide services that are the same as or highly related to the services provided by SCC in association with the Chaser Marks, namely educational services.

92.     The services provided in association with Plaintiffs' Mark target the same or similar types of consumers, namely students seeking educational services.

93.     Plaintiffs' Mark is used in the same geographic area as the use of the Chaser Marks, namely South Carolina and more specifically Spartanburg County.

94.     At the direction of and under the control of Mikota, SCC is using the Chaser Marks to falsely designate the source of SCC's goods and services as though they originated from or are otherwise affiliated with Plaintiffs and/or the estate of Dr. Pilley.

95.     SCC's unauthorized use of the Chaser Marks is likely to cause consumer confusion as to the source of SCC's services and related goods.

1403213v1

96.    SCC's adoption, use, display, and distribution of the Chaser Marks was done at the direction and control of Mikota, who was the driving force behind SCC's actions with respect to the Chaser Marks.

97.    Mikota directed SCC to use the Chaser Marks in manners that exceeded the scope of the license granted to SCC.

98.    Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Marks in a manner that he knew would exceed the scope of use permitted by the license agreement

99.    SCC's use of the Chaser Marks continued after the license agreement permitting use of the Chaser Marks was terminated.

100.    Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Marks after the license agreement had been terminated by Plaintiffs.

101.    Through its simultaneous involvement, approval, direction and control of SCC with respect to its use of the Chaser Marks, the Foundation served as another driving force behind SCC's infringement.  The Foundation provided consent and resources needed by SCC to carry out Mikota's ideas regarding uses of the Chaser Marks and thus commit the infringement of Plaintiffs' Mark.

102.    The actions of SCC, Mikota and/or the Foundation constitute false designation of origin that was committed with knowledge and/or reckless disregard of Plaintiffs' rights.

103.    Through their direction and control of SCC with respect to its actions involving the Chaser Marks, Mikota and the Foundation were involved in the infringement of Plaintiffs' trademark rights and were the driving force behind SCC's infringement.

104.    Plaintiffs are suffering irreparable harm as a result of the infringement.

105. Plaintiffs are entitled to an injunction prohibiting Defendants from using the Chaser Marks or confusingly similar variations thereof.

106. Plaintiffs are entitled to the actual damages caused by Defendants' infringement including a disgorgement of any profits that Defendants have made from their use of the Chaser Marks.

**THIRD CAUSE OF ACTION**
**Common Law Trademark Infringement**
**Against All Defendants**

107. To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

108. Bianchi is the owner of valid common law rights to Plaintiffs' Mark.

109. Use of Plaintiffs' Mark in commerce predates any use of SCC's use of the Chaser Marks in commerce.

110. SCC's use of the Chaser Marks was made pursuant to a trademark license granted by Plaintiffs.

111. Plaintiffs' rights in Plaintiffs' Mark are superior to any rights that SCC may attempt to claim to the Chaser Marks and are enforceable against SCC.

112. Plaintiffs' Mark is used to provide services that are the same as or highly related to the services provided by SCC in association with the Chaser Marks, namely educational services.

113. The services provided in association with Plaintiffs' Mark target the same or similar types of consumers, namely students seeking educational services.

114. Plaintiffs' Mark is used in the same geographic area as the use of Chaser Marks, namely South Carolina and more specifically Spartanburg County.

115.  At the direction of and under the control of Mikota, SCC is using the Chaser Marks to falsely designate the source of their goods and services as though they originated from or are otherwise affiliated with Plaintiffs and/or the estate of Dr. Pilley.

116.  SCC's unauthorized use of the Chaser Marks is likely to cause consumer confusion as to the source of SCC's services and related goods.

117.  SCC's adoption, use, display, and distribution of the Chaser Marks was done at the direction and control of Mikota, who was the driving force behind SCC's actions with respect to the Chaser Marks.

118.  SCC's use of the Chaser Marks exceeded the scope of use permitted by the parties' license agreement.

119.  Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Marks in a manner that he knew would exceed the scope of use permitted by the license agreement.

120.  SCC's use of the Chaser Marks continued after the license agreement permitting use of the Chaser Marks was terminated.

121.  Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Marks after the license agreement had been terminated by the Plaintiffs.

122.  Through its simultaneous involvement, approval, direction and control of SCC with respect to its use of the Chaser Marks, the Foundation served as another driving force behind SCC's infringement.  The Foundation provided consent and resources needed by SCC to carry out Mikota's ideas regarding uses of the Chaser Marks and thus commit the infringement of Plaintiffs' Mark.

123.  The actions of SCC, Mikota and/or the Foundation constitute false designation of origin that was committed with knowledge and/or reckless disregard of Plaintiffs' rights.

124.  Through their direction and control of SCC with respect to its actions involving the Chaser Marks, Mikota and the Foundation were involved in the infringement of Plaintiffs' trademark rights and were the driving force behind SCC's infringement.

125.  Plaintiffs are suffering irreparable harm as a result of the infringement.

126.  Plaintiffs are entitled to an injunction prohibiting Defendants from using the Chaser Marks or confusingly similar variations thereof.

127.  Plaintiffs are entitled to the actual damages caused by Defendants' infringement including a disgorgement of any profits that Defendants have made from their use of the Chaser Marks.

## FOURTH CAUSE OF ACTION
### Declaratory Judgment for Refusal of Applications to Register Chaser Marks
### (15 U.S.C. §1064 and 28 U.S.C. §2201)

128.  To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

129.  Plaintiffs have common law rights to Plaintiffs' Mark that are superior to any rights that SCC may claim in the Chaser Marks.

130.  At the direction and decision of Mikota, SCC has filed or caused to be filed the following trademark applications for variations of the Chaser Marks: Serial No. 99180082 (for SCC Chasers); Serial No. 99211067 (for Chasers); Serial No. 99197664 (for  ); Serial No. 99182515 (for Chaser's Bark Shop); Serial No. 99174047 (for Dream It. Chase It. Live It); Serial No. 99212958 (for  ); and Serial No. 99196277 (for  ) (collectively the "Applied for Marks").

131. SCC's registration of the Applied for Marks would damage Plaintiffs in that SCC will likely attempt to use the registration of any of those marks either (a) to prevent Plaintiffs' use of Plaintiffs' Mark or any other mark that is confusingly similar to the Applied for Marks and/or (b) to justify its continued infringement of Plaintiffs' Mark.

132. SCC is not entitled to register any of the Applied for Marks in light of Plaintiffs' rights to Plaintiffs' Mark and Plaintiffs' ownership of and/or rights in the Applied for Marks pursuant to the original license agreement.

133. The Chaser Marks, including the Applied for Marks, falsely suggest a connection with Dr. Pilley in violation of 15 U.S.C. § 1052.

134. SCC intended for the Chaser Marks, including the Applied for Marks, to suggest a connection with Dr. Pilley.

135. Upon termination of the license agreement, no such affiliation or connection exists.

136. SCC's use of the Chaser Marks, including the Applied for Marks, constitutes an unlawful false association with Dr. Pilley and his work with Chaser.

137. When submitting each of the above referenced applications, SCC stated under penalty of perjury that SCC "believes that the applicant is the owner of the trademark/service mark sought to be registered;" and "To the best of the [SCC's] knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

138. SCC knew or at a very minimum should have known that those statements were false at the time they were being made.

139.  SCC knew or should have known that the Trademark Office would rely on such statements when determining whether to register the Applied for Marks.

140.  SCC intended for the Trademark Office to rely upon such statements.

141.  The Trademark Office would not and will not allow any of the Applied for Marks to register if it knew of or learns of the false nature of the statements submitted by SCC.

142.  The Trademark Office would not and will not allow any of the Applied for Marks to register if it knew of or learned of the prior use of Plaintiffs' Mark and/or Plaintiffs' superior rights in Plaintiffs' Mark.

143.  The Trademark Office would not and will not allow any of the Applied for Marks to register if it knew of or learns of the false connection that is being created and/or implied by the Applied for Marks.

144.  Plaintiffs are entitled to an order directing the Director of the Trademark Office to refuse registration of the Applied for Marks and/or cancelling any registration that may issue for any of the Applied for Marks.

**FIFTH CAUSE OF ACTION**
**Violation of the S.C. Unfair Trade Practices Act**
**Against SCC Mikota and the Foundation**

145.  To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

146.  Defendants' actions are unfair and deceptive in that they likely cause consumer confusion regarding the source of SCC's goods and services that are being provided in commerce.

147.  Defendants' actions are unfair and deceptive in that they have caused and/or are likely to cause consumers to mistakenly believe that SCC's goods and services are affiliated, endorsed or sponsored by Plaintiffs.

148.  Defendants' actions are unfair and deceptive in that they divert consumers looking for Plaintiffs to SCC.

149.  Defendants' actions are unfair and deceptive because they tarnish the memory, legacy and reputation of Dr. Pilley and Chaser by causing consumers to believe that SCC's use of the Chaser Marks and/or Chaser Materials in manners that are inconsistent with the memory, legacy and reputation is affiliated with, sponsored by or endorsed by Plaintiffs.

150.  Defendants' actions are capable of repetition and to otherwise adversely affect the public interest and commerce in general.   In fact, Defendants' actions continue despite Plaintiffs' demands that they cease.

151.  Defendants' actions have been repeated in both electronic and print advertising.

152.  Defendants' actions, as described herein, are in violation of SC Code Ann. § 39-5-20(a).

153.  Defendants' actions have been committed with the intent, purpose and effect of procuring an unfair competitive advantage over Plaintiffs.

154.  Defendants' actions have caused and are causing damages to Plaintiffs.

155.  Defendants' actions are causing Plaintiffs damages by taking Plaintiffs' reputation out of their control and causing lost sales.

156.  Defendants' actions tarnish the reputation and memory of Dr. Pilley and/or Chaser.

157.  As descendant and heir of Dr. Pilley any damage to the reputation of Dr. Pilley causes damage to the reputation of Plaintiffs.

158.  Defendants' actions were and continue to be a willful and knowing violation of SC Code Ann. § 39-5-20(a).

159.  Plaintiffs is entitled to an injunction against Defendants prohibiting Defendants from engaging in unfair and deceptive trade practices as well as treble damages plus attorney fees.

1403213v1

## SIXTH CAUSE OF ACTION
### Breach of Contract Accompanied by a Fraudulent Act
### Against SCC

160. To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

161. SCC entered into a license agreement with Bianchi R. Pilley regarding SCC's use of the Chaser Materials and the Chaser Marks.

162. SCC breached that agreement by using the Chaser Materials and Chaser Marks in a manner that exceeded the scope of the license agreement.

163. When approached by Bianchi and/or R. Pilley regarding the breach and a request that the breaching uses be discontinued, SCC (through Mikota) acted as if the parties had never discussed a license agreement much less entered into one.

164. SCC and Mikota knew those statements were false at the time they were made.

165. SCC and Mikota knew that Plaintiffs believed that a license agreement had been reached in 2020 but remained silent because SCC and Mikota knew that if they stated a belief that no license agreement had been reached, Plaintiffs would take legal action to prevent further use of the Chaser Materials and/or the Chaser Marks by SCC. Therefore, SCC and Mikota operated under the license agreement while withholding from Plaintiffs critical information that SCC and Mikota would later use to try to justify their breach of that agreement.

166. When Plaintiffs brought up the breach and the need for a written license agreement memorializing the original license agreement, SCC proposed terms that were inconsistent with the original license agreement and would in effect assign to SCC all rights to the Chaser Materials and Chaser Marks.

1403213v1

167.  SCC attempted to convince Plaintiffs that such terms were necessary for SCC to "protect the Chaser legacy and the Chaser Images against undesirable third party usage" when in fact it was intended to allow SCC to use the Chaser Materials and Chaser Marks in manners that would harm the legacy of Dr. Pilley and his work with Chaser without any interference by Plaintiffs.

168.  These fraudulent statements and concealments accompanied SCC's breach of the contract and caused Plaintiffs to suffer damages in an amount to be determined at trial.

169.  Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs hereby requests a jury determination of the issues raised and prays that this Court and/or the trier of fact award the following relief:

A.  A determination that Defendants are liable for copyright infringement as a result of their use of the Chaser Materials.

B.  A determination that Defendants are liable for false designation of origin and common law trademark infringement as a result of their use of the Chaser Marks.

C.  An order directing the Director of the U.S. Trademark Office to refuse the registration of any of the Applied for Marks;

D.  A determination that SCC and Mikota are liable for violation of the S.C. Unfair Trade Practices Act;

E.  A determination that SCC is liable for Breach of Contract Accompanied by a Fraudulent Act;

F.  An award of damages resulting from the acts and omission of any of the Defendants, including Plaintiffs' lost sales and reputational damages; Defendants' profits from their use of the

Chaser Materials and/or the Chaser Marks; the costs of the action; and attorneys' fees, the amount of which is to be determined at trial; and,

    G.  An award of punitive damages against SCC; and

    H.  For such other relief as this Court deems just and proper.

Respectfully Submitted,

KIM AND LAHEY LAW FIRM, LLC

*/s/ Hunter Freeman*
Hunter Freeman (Fed. ID 9313)
3620 Pelham Road, PMB 213
Greenville, SC 29615
Tel. 864-609-3473
hfreeman@kimandlahey.com

*Counsel for Plaintiffs*

1403213v1