**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| Deborah Pilley aka Pilley Bianchi dba The Chaser Initiative and Robin Pilley | ) ) ) ) | Civil Action No.: 7:25-cv-13026-DCC |
| Plaintiffs, | ) ) ) | AMENDED COMPLAINT |
| v. | ) ) | (Jury Trial Demanded) |
| Michael Mikota and Spartanburg Community College Foundation, Inc., | ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs Deborah Pilley aka Pilley Bianchi dba The Chaser Initiative ("Bianchi") and Robin Pilley ("R. Pilley") (Bianchi collectively with R. Pilley, "Plaintiffs"), by and through its undersigned counsel, allege and complain against Michael Mikota ("Mikota") and Spartanburg Community College Foundation, Inc. (the "Foundation") as follows.

## THE PARTIES

1.    Bianchi is a resident of Brooklyn, New York and does business as The Chaser Initiative and provides the goods and services described herein under the trademark The Chaser Initiative.

2.    R. Pilley is a resident of Spartanburg County.

3.    Dr. Pilley (now deceased) was a resident of Spartanburg County.  All Dr. Pilley's rights have been bequeathed to Bianchi and/or R. Pilley.

4.     Spartanburg County Commission for Technical and Community Education dba Spartanburg Community College ("SCC"), while not a named party, is the commission in charge of and overseeing the day-to-day activities of the community college that it operates at 107 Community College Drive, Spartanburg, South Carolina.

1403213v1

5. Mikota resides within Spartanburg County, South Carolina and is the president of SCC, who exercises a right to direct and control the actions of SCC, does in fact direct and control the actions of SCC and receives a direct financial benefit from the actions of SCC as directed and controlled by him.

6. The Foundation is a non-profit organization organized and existing under the laws of South Carolina and having an address of 107 Community College Drive, Spartanburg, South Carolina.

## JURISDICTION

7. This action arises under the Lanham Act pursuant to 15 U.S.C. §§ 1051 et seq, 17 U.S.C. §§ 101. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

8. The state and common law causes of action are properly before this Court pursuant to 28 U.S.C. §§ 1338(b) and 1367.

9. Venue is proper under 28 U.S.C. § 1391(b), as all Defendants reside in this District and Division. Moreover, a substantial portion of the acts or omissions alleged herein occurred in this District and Division.

## FACTS COMMON TO ALL CAUSES OF ACTION

10. Bianchi is the daughter and heir of Dr. Pilley.

11. R. Pilley is the daughter and heir of Dr. Pilley.

12. Dr. Pilley, who is now deceased, was a Professor Emeritus of Psychology at Wofford College.

13. Dr. Pilley conducted extensive research regarding the learning capacity of canines.

14. As part of that research, Dr. Pilley taught his pet dog named "Chaser" to understand over 1,000 unique words as well as several elements of syntax.

1403213v1

15.  Dr. Pilley's research and work with Chaser became well known locally, nationally and internationally.

16.  Dr. Pilley's work with Chaser was covered by multiple national media outlets, including, but not limited to, the Today Show, 60 Minutes, ABC World News Tonight, PBS' Nova Science Now, The New York Times and National Geographic Wild.

17.  In 2011, Dr. Pilley published the New York Times bestseller "Chaser: Unlocking the Genius of the Dog Who Knows a Thousand Words."

18.  Bianchi served as a ghost writer for the above referenced book and made significant contributions thereto.

19.  Through their work together and the coverage of that work by numerous third parties, Dr. Pilley and Chaser became inexorably linked, such that reference to one was essentially a reference to the other and/or the reference to one conjures thoughts of and/or an association with the other.

20.  Dr. Pilley passed away in 2018 while Chaser passed away in 2019.

21.  In 2019, four - five large murals were created and prominently displayed in downtown Spartanburg.  These murals displayed "#chaserthestatue", which in turn advertised the unveiling of a bronze statue of Chaser located in Morgan Square.

22.  Bianchi and R. Pilley provided substantial design input and held final approval authority for the statue.

23.  The statue was unveiled in May 2021, and it remains standing to this day.

24.  Bianchi gave the keynote speech at the statue unveiling ceremony.

25.  Bianchi distributed to attendees of the ceremony merchandise and promotional materials branded with "The Chaser Initiative" mark.

1403213v1

26.    In January 2020, Bianchi formed The Chaser Initiative and began preparing educational classes, seminars and workshops to be presented in public schools throughout South Carolina.

27.    In March 2020, Bianchi registered the domain, www.thechaserinitiative.com, which provided information about Dr. Pilley's work with Chaser as well as other educational materials. The website provides users with the ability to schedule educational seminars, classes and workshops.

28.    On approximately September 20, 2020, Bianchi and R. Pilley attended a video conference call with Mikota and other SCC representatives.

29.    During that conference call, Mikota stated that SCC was interested in partnering with Bianchi and R. Pilley on the idea of having the SCC mascot be a border collie named Chaser such that SCC would be known as the Spartanburg Community College Chasers. All involved agreed the mascot would be a representation of Dr. Pilley's dog, Chaser. *See* Ex. 1, pg. 2

30.    Mikota went on to say that both he and SCC wanted to work with the Pilley family so that the mascot would invest in and highlight the memory and life of Dr. Pilley and Chaser. *Id.*

31.    Mikota explained that he and SCC wanted a partnership with the Pilley family and an understanding that SCC would not do anything to damage the memory of Dr. Pilley, Chaser and/or their research and legacy. *Id.*

32.    Mikota repeatedly stated that any use of the Chaser mascot by SCC or any of its representatives would always be in partnership with the Pilley family who was being represented by Bianchi and R. Pilley.

33.    Mikota further acknowledged that SCC's use of the Chaser mascot would necessarily implicate the story and legacy of Dr. Pilley and his work with his pet and research subject, Chaser. *Id.* at pg. 9.

1403213v1

34. In reliance on the representations made by Mikota and other SCC representatives, Bianchi agreed to provide SCC with a photograph that she took of Chaser with Anderson Cooper (the "Chaser Photo") so that SCC could use the Chaser Photo to create potential logos and mascot images based upon that Chaser Photo that could then be reviewed and approved by Bianchi and R. Pilley.

35. In reliance on the representations made by Mikota and other SCC representatives, Bianchi agreed to provide SCC with another photograph that she took of Chaser as she was jumping. SCC used this image to create the following logo , which SCC adopted and used extensively pursuant to the license agreement.

36. On approximately November 9, 2020, Bianchi and R. Pilley attended another video conference call with Mikota and other SCC representatives. *See* Ex. 2.

37. During the call, Mikota stated that, at his direction, SCC had been taking internal steps to prepare for the adoption of the Chaser mascot and invited Bianchi and R. Pilley to provide their input and to attend as many of SCC's planning meetings regarding the adoption of the Chaser mascot as possible.

38. Specifically, Mikota requested input from Bianchi and/or R. Pilley regarding the nature and/or content of the messaging for SCC's use of the Chaser mascot and to provide feedback on any mascot adoption actions taken by SCC prior to the conference call.

39. During the conference call, Jane Byrd, an artist employed and/or hired by SCC, displayed various logos and materials that she created from the Chaser Photo that Bianchi previously provided.

1403213v1

40. Byrd went on to explain that Chaser "embodies a designer's dream" because her appearance stands out from that of typical border collies.

41. Byrd also explained that the use of the Chaser image and/or logo would pay tribute to Dr. Pilley and his legacy.

42. Based on the representations and promises made by Mikota and other SCC representatives, Bianchi and R. Pilley entered into a verbal license agreement wherein SCC and its representatives could use the images, logos and mascot designs created from Bianchi's Chaser Photo, as well as other materials provided by Bianchi, and to use "Chaser" and/or "Chasers" as trademarks (the "Chaser Marks") to identify SCC's educational goods and services.

43. All parties involved, including Mikota and SCC, understood that pursuant to the license, Bianchi and R. Pilley would have approval and/or veto power with respect to the manners in which the logos, mascot and/or trademarks could be used to protect the legacy created by Dr. Pilley and Chaser and represented by such images the logos, mascot and trademarks.

44. In December 2020, Bianchi provided substantial input as to the approved look of the mascot, which SCC accepted when formulating the final design of the Chaser mascot.

45. On approximately March 5, 2021, SCC signed an agreement with The Chaser Initiative pursuant to which Ingrid Norris would teach first aid for dogs and cats under the mark The Chaser Initiative. On behalf of The Chaser Initiative, Ms. Norris provided these classes at SCC from approximately September 2021 – May 2025.

46. SCC announced its adoption of the Chaser mascot on November 2, 2021, with Bianchi delivering a speech as part of the ceremony. With the approval of Bianchi and R. Pilley, SCC began publicly displaying the logos and mascot designs derived from Bianchi's Chaser Photo as well as using the Chaser trademarks to identify the source of its goods and services.

1403213v1

47. On or about November 2, 2021, SCC publicly displayed on its website a webpage discussing SCC's adoption of the Chaser mascot and included an entire section entitled "Why the Chasers?" that explained the link between SCC's selection and adoption of the mascot and Dr. Pilley's work with Chaser. *See* Ex. 3.

48. On the webpage, SCC stated that "we want the story of Chaser's connection as the SCC mascot to be known by everyone in the Upstate." The webpage further stated that "much like Chaser's story, the lasting legacy of our students' education won't be limited to what they know, but rather the spirit in which they learned…"

49. From September 2021 to December 2025, a representative of The Chaser Initiative provided numerous educational seminars at public schools throughout South Carolina under The Chaser Initiative brand name. At each seminar, goody bags were handed out that included coloring books, crayons, tote bags and flyers, all of which were branded with The Chaser Initiative and featured images of Chaser.

50. Bianchi presented Mikota with a copy of Dr. Pilley's book that included an inked paw print of Chaser as a "pawtograph." To create the pawtograph, Bianchi dipped Chaser's paw in ink and then pressed it against the title page of Dr. Pilley's book. This pawtographed version of the book is very rare and limited in number.

51. At Mikota's direction, SCC used Mikota's copy of Dr. Pilley's book and more specifically, the paw print contained therein, to create a logo that reproduced the paw print as closely as possible.

52. Pursuant to the license agreement, SCC adopted and prominently used the paw logo. SCC later filed at least two trademark applications on its recreations of Chaser's paw print.

1403213v1

53.     In April 2023, Bianchi contacted SCC to discuss its use of a photograph of Chaser in SCC's marketing materials that Bianchi felt was unacceptable.  SCC agreed to discontinue use of the photograph and instead adopted use of another photograph that was provided by Bianchi for SCC's approved and licensed use.

54.     In August 2023, Bianchi published a book that she authored entitled "For the Love of Dog, The Ultimate Relationship Guide."  Bianchi's book became a number 1 best seller on Amazon and the winner of the 2024 AKC Family Dog Award.

55.     In late May or early June of 2024, Bianchi contacted Mikota to discuss a written license agreement that would memorialize the verbal agreement that had been governing SCC's use of the Chaser logos, mascot design and trademarks.

56.     On the morning of October 22, 2024, Mikota delivered to Bianchi a proposed written license agreement.

57.     In that proposed agreement, SCC stated that "prior to this Agreement, certain members of the Pilley Group authorized SCC to use Chaser's name, image and likeness as a mascot for SCC and in connection with the SCC Mission, and authorized the creation, authorship and development of intellectual properties by SCC related to Chaser in support of the SCC Mission."  *See* Ex. 3.

58.     The proposed license agreement further states that "photographs of Chaser, for which the Pilley Group owns the copyrights, have been used by SCC as models for various images and graphic representations created under the auspices of SCC, including by way of example but not limited to the following  (hereafter the Chaser Images)."

59. The proposed license agreement further states that "it is the Pilley Group's desire that the legacy of Dr. Pilley and the beloved Chaser continues to inspire thousands of students, faculty, staff and community members, and the Parties intend this Agreement as an instrument that will facilitate pursuing that desire."

60. The proposed license sought to have The Pilley Group grant and transfer to SCC an irrevocable exclusive license to (a) use Chaser and/or Chasers as the name of SCC's mascot; (b) to use Chaser and/or Chasers as trademarks identifying SCC as the source of its services; and (c) to make, use and sell photographs, images, models, and other items based upon the image of Chaser, such as the logos created from Bianchi's Chaser Photo.

61. Many of the terms in the proposed license agreement were either in addition to the terms previously agreed upon by the parties and/or inconsistent with those previously agreed upon terms.

62. Hours after providing Bianchi with the proposed written license agreement, SCC hosted a masterclass featuring Bianchi where she discussed her book "For the Love of Dog" as well as Dr. Pilley's work with Chaser.

63. Since being provided with the proposed written license agreement, Bianchi entered into negotiations with SCC in which Mikota was Bianchi's primary point of contact at SCC.

64. During those negotiations Bianchi learned that SCC was using the Chaser logo, images and/or mascot in manners that were not approved by Bianchi and/or R. Pilley and likely to tarnish and/or damage the reputation and/or legacy of Dr. Pilley and/or Chaser and are not authorized by the original license granted to SCC for use of the Chaser images, logos, mascot and/or trademarks.

65. Bianchi and R. Pilley requested Mikota and SCC to cease such uses. Mikota and SCC refused such requests.

1403213v1

66. When it became clear that Mikota and SCC had no intention of honoring the initial license agreement or negotiating a modification to the license agreement that would be mutually acceptable to all parties involved, Bianchi and R. Pilley terminated the license agreement.

67. At Mikota's direction and control, SCC continues to use the logos, images and mascot designs derived from Bianchi's Chaser Photo.

68. At Mikota's direction and control, SCC continues to use Chaser and/or Chasers as trademarks to identify the source of its goods and services.

**FIRST CAUSE OF ACTION**
**Indirect Copyright Infringement via Vicarious and Contributory Infringement**
**Against All Defendants**

69. To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

70. Bianchi is the author of the Chaser Photo.

71. Bianchi is the owner of the copyrights to the Chaser Photo.

72. The copyrights to the Chaser Photo have been registered with the Copyright Office and have been issued Copyright Registration No. Vau 1-557-840, having an effective registration date of June 29, 2025.

73. The logos, images, trademarks and mascot designs adopted, used, displayed and distributed by SCC are substantially similar to and were derived from the Chaser Photo.

74. SCC's adoption, use, display, and distribution of logos, images, trademarks and mascot designs derived from the Chaser Photo (the "Chaser Materials) was done at the direction and control of Mikota, who was the driving force behind SCC's actions with respect to the Chaser Materials.

75. SCC's use of the Chaser Materials exceeded the scope of use permitted by the parties' license agreement.

76. Mikota directed, controlled, participated in, supervised and/or approved SCC's use of the Chaser Materials in a manner that he knew would exceed the scope of use permitted by the license agreement.

77. SCC's use of the Chaser Materials continued after the license agreement permitting use of the Chaser Materials was terminated.

78. Mikota directed, controlled, participated in, supervised and/or approved SCC's use of the Chaser Materials after the license agreement had been terminated by Plaintiffs.

79. The actions of SCC and/or Mikota constitute copyright infringement that was committed with knowledge and/or reckless disregard of Bianchi's rights.

80. Through his direction, control, supervision of SCC with respect to its actions involving the Chaser Materials, Mikota was personally involved in the infringement of Bianchi's copyrights in the Chaser Photo and was the driving force behind SCC's infringement.

81. It was Mikota's initial idea to adopt and use the Chaser Materials.

82. Through his direction, control, supervision and participation in SCC's infringing activities, Mikota both induced SCC to infringe Bianchi's copyrights and materially contributed to the infringement by providing the necessary consent, direction and resources to carry out the infringement.

83. Mikota directed, controlled, participated in, supervised and approved SCC's infringement with an intent to injure Plaintiffs and with actual malice towards Plaintiffs.

84. Mikota committed fraud when inducing and contributing to SCC's infringement.

1403213v1

85.    Mikota made representations and promises regarding the intentions that SCC's use of the Chaser Materials and/or the Chaser photo would forever and always be in partnership with the Pilley family and/or subject to approval by the Pilley family.

86.    When those representations were made Mikota had no intention that SCC or Mikota would abide by the promises made therein.

87.    When approached by Bianchi and/or R. Pilley regarding SCC's breach of the license agreement and a request that the breaching uses be discontinued, Mikota acted as if the parties had never discussed a license agreement much less entered into one.  Mikota caused SCC to act in the same manner.

88.    Mikota knew those statements were false at the time they were made.

89.    Mikota knew that Plaintiffs believed that a license agreement had been reached in 2020 but remained silent because SCC and Mikota knew that if they stated a belief that no license agreement had been reached, Plaintiffs would take legal action to prevent further use of the Chaser Materials, Chaser Photo and/or the Chaser Marks by SCC. Therefore, SCC and Mikota operated under the license agreement while withholding from Plaintiffs critical information that SCC and Mikota would later use to try to justify their breach of that agreement.

90.    When Plaintiffs brought up the breach and the need for a written license agreement memorializing the original license agreement, Mikota proposed terms that were inconsistent with the original license agreement and would in effect assign to SCC all rights to the Chaser Materials and Chaser Marks.

91.    Mikota attempted to convince Plaintiffs that such terms were necessary for SCC to "protect the Chaser legacy and the Chaser Images against undesirable third party usage" when in fact it was intended to allow SCC to use the Chaser Materials and Chaser Marks in manners that

1403213v1

would harm the legacy of Dr. Pilley and his work with Chaser without any interference by Plaintiffs.

92. The Foundation had the right to direct, control and/or supervise SCC's actions.

93. Through its simultaneous involvement, approval, direction and control of SCC with respect to its actions involving the Chaser Materials, the Foundation served as another driving force behind SCC's infringement. The Foundation provided consent and resources needed by SCC to carry out Mikota's idea and thus commit the infringement of the Chaser Photo.

94. Through its direction, control, supervision and participation in SCC's infringing activities, the Foundation both induced SCC to infringe Bianchi's copyrights and materially contributed to the infringement by providing the necessary consent, direction and resources to carry out the infringement.

95. Both Mikota and the Foundation have an obvious and direct financial interest in the infringing activities, including those of SCC.

96. Mikota's compensation, including both his salary and his bonuses, are tied to the financial performance of SCC.

97. The Foundation's revenues and profits are tied to the financial performance and/or public notoriety of SCC as it is easier to raise money when SCC's reputation has a farther reach.

98. Mikota and the Foundation both knew that SCC's infringing use of the Chaser Photo and/or Chaser Materials would improve the notoriety of, public recognition of and/or the financial performance of SCC, which would in turn financially benefit both Mikota and the Foundation.

99. Bianchi is suffering irreparable harm as a result of the infringement.

100. Bianchi is entitled to an injunction prohibiting Defendants from using the Chaser Materials or any other materials that would violate Bianchi's copyrights under the Copyright Act.

1403213v1

101. Bianchi is entitled to the actual damages from one or more of the Defendants that were caused by their copyright infringement.

## SECOND CAUSE OF ACTION
### False Designation of Origin Under 15 U.S.C. §1125
### Against All Defendants

102. To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

103. Bianchi is the owner of valid common law rights to the mark "The Chaser Initiative" ("Plaintiffs' Mark").

104. Use of Plaintiffs' Mark in commerce predates any use of SCC's use of the Chaser Marks in commerce.

105. SCC's use of the Chaser Marks was made pursuant to a trademark license granted by Plaintiffs. Accordingly, all rights (if any) associated with SCC's use of the Chaser Marks inured to the benefit of Plaintiffs pursuant to the license agreement. Accordingly, Plaintiffs have ownership of and/or rights in the Chaser Marks.

106. Plaintiffs' rights in Plaintiffs' Mark are superior to any rights that SCC may attempt to claim to the Chaser Marks and are enforceable against SCC.

107. Plaintiffs' Mark is used to provide services that are the same as or highly related to the services provided by SCC in association with the Chaser Marks, namely educational services.

108. The services provided in association with Plaintiffs' Mark target the same or similar types of consumers, namely students seeking educational services.

109. Plaintiffs' Mark is used in the same geographic area as the use of the Chaser Marks, namely South Carolina and more specifically Spartanburg County.

1403213v1

110. At the direction of and under the control of Mikota, SCC is using the Chaser Marks to falsely designate the source of SCC's goods and services as though they originated from or are otherwise affiliated with Plaintiffs and/or the estate of Dr. Pilley.

111. At the direction of and under the control of the Foundation, SCC is using the Chaser Marks to falsely designate the source of SCC's goods and services as though they originated from or are otherwise affiliated with Plaintiffs and/or the estate of Dr. Pilley.

112. SCC's unauthorized use of the Chaser Marks is likely to cause consumer confusion as to the source of SCC's services and related goods.

113. SCC's adoption, use, display, and distribution of the Chaser Marks was done at the direction and control of Mikota, who was the driving force behind SCC's actions with respect to the Chaser Marks.

114. Mikota directed SCC to use the Chaser Marks in manners that exceeded the scope of the license granted to SCC.

115. Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Marks in a manner that he knew would exceed the scope of use permitted by the license agreement

116. SCC's use of the Chaser Marks continued after the license agreement permitting use of the Chaser Marks was terminated.

117. Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Marks after the license agreement had been terminated by Plaintiffs.

118. Through its simultaneous involvement, approval, direction and control of SCC with respect to its use of the Chaser Marks, the Foundation served as another driving force behind SCC's infringement. The Foundation provided consent and resources needed by SCC to carry out

1403213v1

Mikota's ideas regarding uses of the Chaser Marks and thus commit the infringement of Plaintiffs' Mark.

119. The actions of SCC, Mikota and/or the Foundation constitute false designation of origin that was committed with knowledge and/or reckless disregard of Plaintiffs' rights.

120. Through their direction and control of SCC with respect to its actions involving the Chaser Marks, Mikota and the Foundation were involved in the infringement of Plaintiffs' trademark rights and were the driving force behind SCC's infringement.

121. Both Mikota and the Foundation financially benefited from the infringement of Plaintiff's Marks.

122. Plaintiffs are suffering irreparable harm as a result of the infringement.

123. Plaintiffs are entitled to an injunction prohibiting Defendants from using the Chaser Marks or confusingly similar variations thereof.

124. Plaintiffs are entitled to the actual damages from one or more of the Defendants that were caused by their infringement.

### THIRD CAUSE OF ACTION
### Common Law Trademark Infringement
### Against All Defendants

125. To the extent not inconsistent with the below allegations, Plaintiffs reallege the allegations contained in the above paragraphs as if fully repeated herein.

126. Bianchi is the owner of valid common law rights to Plaintiffs' Mark.

127. Use of Plaintiffs' Mark in commerce predates any use of SCC's use of the Chaser Marks in commerce.

128. SCC's use of the Chaser Marks was made pursuant to a trademark license granted by Plaintiffs.

1403213v1

129.  Plaintiffs' rights in Plaintiffs' Mark are superior to any rights that SCC may attempt to claim to the Chaser Marks and are enforceable against SCC.

130.  Plaintiffs' Mark is used to provide services that are the same as or highly related to the services provided by SCC in association with the Chaser Marks, namely educational services.

131.  The services provided in association with Plaintiffs' Mark target the same or similar types of consumers, namely students seeking educational services.

132.  Plaintiffs' Mark is used in the same geographic area as the use of Chaser Marks, namely South Carolina and more specifically Spartanburg County.

133.  At the direction of and under the control of Mikota, SCC is using the Chaser Marks to falsely designate the source of their goods and services as though they originated from or are otherwise affiliated with the Chaser Initiative, Plaintiffs and/or the estate of Dr. Pilley.

134.  SCC's unauthorized use of the Chaser Marks is likely to cause consumer confusion as to the source of SCC's services and related goods and has in fact caused consumer confusion regarding SCC's affiliation with the Chaser Initiative, Plaintiffs and/or the estate of Dr. Pilley.

135.  SCC's adoption, use, display, and distribution of the Chaser Marks was done at the direction and control of Mikota, who was the driving force behind SCC's actions with respect to the Chaser Marks.

136.  SCC's use of the Chaser Marks exceeded the scope of use permitted by the parties' license agreement.

137.  Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Marks in a manner that he knew would exceed the scope of use permitted by the license agreement.

138.  SCC's use of the Chaser Marks continued after the license agreement permitting use of the Chaser Marks was terminated.

1403213v1

139.  Mikota directed, controlled, supervised and/or approved SCC's use of the Chaser Marks after the license agreement had been terminated by the Plaintiffs.

140.  Through its simultaneous involvement, approval, direction and control of SCC with respect to its use of the Chaser Marks, the Foundation served as another driving force behind SCC's infringement.  The Foundation provided consent and resources needed by SCC to carry out Mikota's ideas regarding uses of the Chaser Marks and thus commit the infringement of Plaintiffs' Mark.

141.  The actions of SCC, Mikota and/or the Foundation constitute false designation of origin that was committed with knowledge and/or reckless disregard of Plaintiffs' rights.

142.  Through their direction and control of SCC with respect to its actions involving the Chaser Marks, Mikota and the Foundation were involved in the infringement of Plaintiffs' trademark rights and were the driving force behind SCC's infringement.

143.  Both Mikota and the Foundation financially benefited from the infringement of Plaintiff's Mark.

144.  Plaintiffs are suffering irreparable harm as a result of the infringement.

145.  Plaintiffs are entitled to an injunction prohibiting Defendants from using the Chaser Marks or confusingly similar variations thereof.

146.  Plaintiffs are entitled to the actual damages caused by Defendants' infringement including a disgorgement of any profits that Defendants have made from their use of the Chaser Marks.

**WHEREFORE**, Plaintiffs hereby requests a jury determination of the issues raised and prays that this Court and/or the trier of fact award the following relief:

1403213v1

A.  A determination that Defendants are liable for indirect copyright infringement as a result of their use of the Chaser Materials.

B.  A determination that Defendants are liable for false designation of origin and common law trademark infringement as a result of their use of the Chaser Marks.

C.  Injunctive relief that would prohibit either of the Defendants from engaging in further infringing conduct and/or contributing to SCC's infringement of Plaintiff's copyrights and/or trademark rights in the Chaser Materials and Plaintiffs' Marks.

D.  An award of damages resulting from the acts and omission of the Foundation, including Plaintiffs' lost sales and reputational damages; Defendants' profits from their use of the Chaser Materials and/or the Chaser Marks; the costs of the action; and attorneys' fees, the amount of which is to be determined at trial; and

E.  For such other relief as this Court deems just and proper.

Respectfully Submitted,

KIM AND LAHEY LAW FIRM, LLC

*/s/ Hunter Freeman*
Hunter Freeman (Fed. ID 9313)
3620 Pelham Road, PMB 213
Greenville, SC 29615
Tel. 864-609-3473
hfreeman@kimandlahey.com

*Counsel for Plaintiffs*

1403213v1